25CA0424 Marriage of Kiphardt 03-05-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0424
City and County of Denver District Court No. 18DR30792
Honorable Adam J. Espinosa, Judge

---

In re the Marriage of

Phillip Kiphardt,

Appellee,

and

Margaret Martin Kiphardt,

Appellant.

---

ORDER AFFIRMED

Division VI
Opinion by JUDGE YUN
Grove and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 5, 2026

---

The Demkowicz Law Firm, LLC, Danielle L. Demkowicz, Centennial, Colorado, for Appellee

Cox Baker Page & Bailey, LLC, James S. Bailey, Alexandra K. Wetzler, Lone Tree, Colorado; Sherr Puttmann Akins Lamb PC, Tanya L. Akins, Denver, Colorado, for Appellant

¶ 1    In this post-dissolution of marriage proceeding between Margaret Martin Kiphardt (mother) and Phillip Kiphardt (father), mother appeals the district court's order adopting a magistrate's ruling that modified parenting time. Mother contends the district court erred by adopting the magistrate's decision because (1) the magistrate applied the incorrect legal standard, and (2) the record does not support the magistrate's finding that the children were endangered in mother's care. We affirm the district court's order.

## I.    Background

¶ 2    The parties married in 2015 and separated in 2018. They have two children together: B.K., born in 2015, and C.K., born in 2018. In June 2020, *nunc pro tunc* to May 2019, the district court entered permanent orders allocating parental responsibilities. The court found that father had "serious anger management issues" and had perpetrated domestic abuse during the parties' relationship. It also found that mother had "an issue with alcohol that she's probably going to be struggling with for the rest of her life." But it found that both parties had a good relationship with the children and that neither father's anger nor mother's struggles with alcohol were "detrimental to the kids." The court awarded mother primary

residential care and sole decision-making responsibility for the children; father received parenting time during certain weekends, holidays, and vacations. The court permitted mother and the children to move to Tennessee, while father remained in Colorado.

¶ 3    In November 2021, father filed a motion to modify parenting time, claiming that mother was "drinking heavily" and endangering the children. The magistrate appointed a child and family investigator (CFI), who issued an initial report in September 2022 finding that the children were doing well in mother's care. The CFI explained,

> There is credible evidence that [m]other did have a drinking problem, but there is also credible evidence that she no longer drinks. Her fiancé . . . , with whom she lives, stated that [m]other abstains from alcohol. [The fiancé] himself has been sober for three years and is employed as a counselor at a drug and alcohol rehab center. Mother's references state that [to] their knowledge, [m]other does not have a problem with alcohol. The children state that [m]other does not drink. Mother has been getting the children to school on time, and according to their teachers, they appear well-rested, healthy, clean, and appropriately dressed.

Accordingly, the CFI recommended that the children continue to reside primarily with mother in Tennessee and spend their summer vacations with father in Colorado.

¶ 4 But six months later, in March 2023, mother relapsed and entered inpatient treatment for alcohol use. The parties agreed to allow the CFI to conduct a supplemental investigation. Two days after her discharge from treatment in May 2023, mother relapsed again. She notified father of her relapse, and the parties agreed that father would take the children that summer while mother focused on her recovery. Following a second round of treatment, mother voluntarily signed up for sobriety monitoring through a service called Soberlink. Subsequently, in July 2023, the magistrate ordered that mother continue to take Soberlink tests four times per day. On October 2, 2023, mother also voluntarily took a hair follicle test, which can determine if a person has consumed alcohol within the last ninety days. All of mother's tests were negative for alcohol.

¶ 5 On October 16, 2023, the CFI submitted her supplemental report, noting that the parents "are both amazing . . . in the sense that they absolutely adore their children and want what is best for

them" and that "[t]he children adore both parents." She also observed that, "[w]hen not under the influence of alcohol, [mother] is a wonderful, fun, and nurturing parent." But the CFI also found that "[c]ircumstances [had] changed" since she issued her initial report in September 2022. Specifically, during her supplemental investigation, she discovered that mother attended residential treatment for alcohol use disorder in 2019, 2021, and 2022, in addition to her most recent treatment in 2023. Mother admitted to drinking up to four bottles of wine daily before seeking treatment. Due to mother's ongoing struggles with alcohol use, the CFI found that the children were endangered in her care, and she recommended modifying parenting time so that the children would reside with father during the school year and with mother during summers and holidays. The CFI summarized the basis for her recommendation as follows:

> The issue is that [mother] has yet to prove long-term sobriety. Her excessive drinking has endangered the boys. They said that their mom was sick a lot and she slept a lot. They are only five and seven years old and need trustworthy care and supervision. . . . The children have suffered emotional distress. [B.K.] stated that he does not like even the word "alcohol," he knows what it is, and it

4

makes him think bad things. He said that he wishes that drink was never made, and he said that his mom told him that she is allergic to alcohol. Five-year-old [C.K.] was able to articulate that it was disrespectful for their mom to sit in bed and keep drinking alcohol when they asked her not to do so.

. . . .

The biggest factors contributing to the recommendations are that [mother] has been to inpatient treatment almost every year since 2019, and she relapsed again two days after getting out of her most recent thirty-day treatment. Furthermore, [father] was not informed for ten days that she was in treatment this last time around, and the children had more of an acute awareness of her drinking than originally thought. . . . [Mother] is a lovely person and loving mother when sober. She is convincing and can articulate well that she knows what she needs to do to remain sober. The CFI believes that she does know what she needs to do, but her issues run deep and she may need more intense treatment. [Mother] may need more time to work on herself and to fully delve into the trauma that keeps leading her to drink. In the meantime, the children are at extreme risk of further endangerment of their physical health and significant impairment of their emotional development.

The CFI does not take these recommendations lightly, understanding the potential implications for the boys, including the necessity of switching schools and the emotional impact of being separated from their

5

mother. The CFI believes this is outweighed by the advantage to the children of residing primarily with the parent who is better able to keep them physically and emotionally safe.

¶ 6 In February 2024, the magistrate held a hearing on father's motion to modify parenting time. During the proceeding, the CFI testified that mother had not been completely transparent about her alcohol consumption during the initial investigation, such that the CFI was not aware of mother's multiple residential treatments until the second investigation. She further testified that mother reported "drink[ing] in excess" for "up to several months before going into rehab," which the CFI understood to mean "possibly up to three or four months." Accordingly, she testified that

> the longest amount of time then that I guess [m]other could have been drinking in excess, chronically could have been three months, then she went to rehab for a month. So that means every year for the four years that the boys have been in the primary care of their mother, there could have been four months out of the year, or one third of the entire year where their mother was not mentally and physically, emotionally present for them. That is significant.

¶ 7 Regarding her interviews with the children, the CFI testified that C.K. "did say he knows [mother] drinks, and she gets really,

6

really sleepy and quiet after she drinks." She also testified that B.K., the older child, "got really visibly distraught when [she] just brought the word alcohol up when talking with him," leaving her with the impression that "he didn't want to say anything about his mom's drinking."

¶ 8 After the hearing, the magistrate designated father as the children's primary residential parent. The magistrate noted that, under section 14-10-129(2)(b), C.R.S. 2025, she was required to

> retain the parenting time schedule established in the prior decree unless . . . [t]he child[ren]'s present environment endangers the child[ren]'s physical health or significantly impairs the child[ren]'s emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child[ren].

The magistrate then found that, "for the reasons cited in the CFI report, the children are emotionally and physically endangered in [m]other's care." Specifically, she found that mother had "received treatment for alcohol use at least four times" since permanent orders; that mother had "been secretive about her alcohol consumption"; that the children did "not have sufficient support . . . to keep them safe from neglect" when mother was drinking; and,

"most importantly, that the very young children are aware of her alcohol use," with the older child "feeling pressure to cover for [her]." Although the magistrate considered evidence that "[m]other is a lovely person and loving [m]other" and that a "change in the majority time parent" could be difficult for the children, especially since father had never been the "school year 'homework and chores' parent," she concluded that the children's need for "a stable environment in which a parent is alert and able to parent" outweighed all other concerns.

¶ 9    Mother petitioned the district court to review the ruling, arguing that the magistrate misapplied the law and made findings unsupported by the record. The court rejected mother's arguments and adopted the magistrate's ruling.

¶ 10    Mother now appeals.

## II.    Analysis

¶ 11    Mother contends that the magistrate failed to conduct the required three-step analysis for parenting time modifications that change the children's primary residential parent. She also asserts that the evidence was insufficient to satisfy that test. We disagree.

8

### A. Applicable Law and Standard of Review

¶ 12     Under section 14-10-129(2), the court cannot substantially modify parenting time and change the child's primary residential parent unless it finds that a change has occurred in the child's or primary residential parent's circumstances and that the modification is necessary to serve the child's best interests. Moreover, the court must retain the prior parenting time schedule unless, as relevant here, (1) the child's present environment endangers the child's physical health or significantly impairs the child's emotional development, and (2) the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child. § 14-10-129(2)(d).

¶ 13     Thus, the court must apply "a three-step analytical process." *In re Marriage of Schlundt*, 2021 COA 58, ¶ 35 (citation omitted). First, it must start from a presumption that the prior order shall be retained. *Id.* Second, it must find that "the child is endangered by the status quo and that modifying the existing order will create advantages that outweigh any harm caused by the modification." *Id.* Third, it must find that the proposed modification is in the child's best interests. *Id.*

¶ 14     Our review of a district court's order adopting a magistrate's decision is effectively a second layer of appellate review. *In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 11. We review de novo whether the magistrate and the court applied the correct legal standard. *Id.* We also review de novo their conclusions of law, but we accept the magistrate's factual findings unless they are clearly erroneous. *Id.* A factual finding is clearly erroneous when it has no record support. *Id.*

¶ 15     While express findings are generally preferable, they are not required. *Id.* at ¶ 23. As long as the magistrate's findings demonstrate the application of the statute and are sufficiently explicit to allow us to review those determinations, implicit findings suffice. *Id.*; *see also In re Marriage of Rodrick*, 176 P.3d 806, 813-14 (Colo. App. 2007) (affirming a court's parental responsibilities decision when its findings sufficiently showed that it considered the statutory criteria, even though it did not make specific findings on each factor).

## B.     Presumption

¶ 16    Mother argues that the magistrate failed to apply the presumption in favor of retaining the prior parenting time order.

¶ 17    We acknowledge that the magistrate did not explicitly reference the presumption.  But she cited section 14-10-129(2)(d) and explicitly recognized that the prior parenting time order could be modified only if the children were endangered by their current environment.  And she expressly found that this standard was satisfied.  In doing so, the magistrate effectively applied the presumption, even if she did not refer to it as such.  *See S.Z.S.*, ¶ 21 (recognizing that a magistrate's findings may be implicit); *cf. Schlundt*, ¶ 36 (holding that the court failed to apply the presumption where it did not make findings necessary to overcome it).  We therefore see no error at the first step of the analysis.

## C.    Endangerment Finding

¶ 18    Mother argues that the record does not support the magistrate's determination that the children were endangered in her care.  Specifically, she challenges "five key findings used by the magistrate in reaching her ultimate conclusion that the children were endangered."  We address each contention in turn.

### 1.    Multiple Relapses

¶ 19    Mother concedes that her pattern of treatments and relapses was "an appropriate consideration for the [magistrate]."  But she

11

argues that the magistrate placed too much weight on this history, especially considering the undisputed evidence that she was sober at the time of the hearing.

¶ 20    However, the weight of the evidence, its probative value, and the inferences and conclusions to be drawn from it are within the trial court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). Thus, we may not reweigh the evidence and substitute our judgment for that of the magistrate. *Id.*

## 2. History of Secrecy

¶ 21    Mother argues that there was no evidence to support the magistrate's finding that she had a "history of secrecy about alcohol use." But the CFI testified that mother had been drinking "heavily and secretly up to several months before she goes to rehab" and that mother was not "completely forthcoming" about her alcohol use during the initial investigation. The CFI further testified that it was her impression, based on her interviews with the children, that the older child had "gotten the message that he has to keep his [m]other's drinking secret." When asked what her concerns would be if the magistrate did not adopt her recommendation, she responded that she would be "concerned that [mother] would drink

12

heavily, and also secretly, while caring for the children," and that the children would feel pressure to "keep it secret."

¶ 22     While mother admits that she did not tell father right away about her relapse in May 2023, she argues that the magistrate erred by finding that she waited ten days when the CFI testified that it was "maybe five or six days."  But the CFI also testified that mother initially told father that she was in "intensive trauma treatment," not alcohol treatment.  Thus, while the magistrate may have been mistaken about the exact length of the delay, the record nonetheless supports the finding that mother was not immediately forthcoming with father regarding her relapse and treatment.

¶ 23     Finally, the magistrate found that there was a history of secrecy not just by mother but surrounding her.  Specifically, the magistrate noted that,

> In the 2022 [CFI] report, [m]other's parents . . .
> as well as her neighbor [and her fiancé's
> brother] all reported that [m]other did not have
> a problem with alcohol and [her fiancé] did not
> report any concerns, even though at least
> [m]other's family was likely aware that she had
> been in treatment for drinking.  This narrative
> continues now — everyone says [m]other is
> fine.  But the Court finds that these close
> friends and family would be likely to sugar
> coat any troubles and would not be honest

reporters when the children were endangered in [m]other's care.

¶ 24 Mother points to evidence that could have supported a contrary finding, including testimony by an expert in psychology, addiction, and mental health that she was cooperative, engaging, non-defensive, and "very forthcoming about her history of alcohol use." But it is the magistrate's role, not ours, to resolve questions of conflicting evidence. *Id.* Because there is record support for the findings, the magistrate's resolution of conflicting evidence is binding on review. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

### 3. Children's Awareness

¶ 25 Mother argues that there was no evidence to support the magistrate's finding that the children were aware of and distressed by her alcohol use. Specifically, she argues that the magistrate erred by admitting, over a hearsay objection, testimony by father's sister that C.K. told her he found mother's drinking upsetting and disrespectful.

¶ 26 But even assuming, without deciding, that the magistrate erred by admitting C.K.'s statement as an excited utterance, and

14

setting that statement aside, there was other testimony about the children's knowledge of, and discomfort with, mother's alcohol use. Specifically, the CFI testified about her interviews with the children and emphasized the "emotionally distraught" way B.K. said that he hated alcohol and "wished [it] was never invented." In describing B.K.'s response to her mention of alcohol, she testified that she had "rarely seen a child get so distraught like that after just hearing one word." She also testified that C.K. "did say he knows [mother] drinks." And she noted in her supplemental report that C.K. "is aware of the concept of alcohol and notes that his dad consumes it, but not much. His mom's behavior changes after drinking, causing her to become sleepy and quiet."

¶ 27    Thus, even without considering father's sister's testimony, there was evidence in the record to support the magistrate's finding that the children were aware of mother's drinking and that at least the older child was upset by it. *See S.Z.S.*, ¶ 11 (A factual finding is clearly erroneous when it has no record support.).

### 4.    Neglect

¶ 28    Mother argues that there was no evidence to support the magistrate's finding that the children were neglected while in her

care. Specifically, she argues that, although she "had self-reported that she drank anywhere from one or two weeks to up to several months during a relapse," the magistrate made an overly harsh inference by determining that the children were consequently neglected for months at a time.

¶ 29 We acknowledge that there was conflicting evidence on this point. The CFI's report noted that both children were well adjusted and thriving socially and academically, with the older child earning excellent grades and the younger one "always clean, well-rested, healthy, and appropriately dressed." The CFI also reported that mother's fiancé and several babysitters cared for the children while mother was in residential treatment, with the younger child recalling that "some really nice babysitters" looked after him.

¶ 30 But mother herself admitted that her relapses involved periods of weeks to months of heavy drinking before going to rehab, and the CFI testified that these periods of drinking were secret. Given the CFI's testimony that mother had a history of "covertly drinking excessively and chronically [when] nobody knew," it was reasonable for the magistrate to infer that mother could not be a vigilant and engaged parent during those periods.

¶ 31 "[W]e may not reweigh the magistrate's resolution of the conflicts in the evidence." *Id.* at ¶ 28. Accordingly, we conclude that the magistrate's finding that the children were neglected in mother's care was supported by the record.

### 5. Ability to Comply with Testing

¶ 32 Mother argues that there was no evidence to support the magistrate's finding that she was "unable to comply with Soberlink testing." Again, the evidence on this point was conflicting. Although mother completed 1,067 compliant tests between May 2023 and February 2024, the record also shows five noncompliant tests during that period.[1] And the magistrate found, and mother does not dispute, that she "stopped providing Soberlink testing results at all in February 2024." But more importantly, the magistrate adopted the CFI's finding that mother has "yet to prove long-term sobriety" in light of her five prior relapses and "may need more time to work on herself and to fully delve into the trauma that keeps leading her to drink." Because we are bound by the

---

[1] The noncompliant tests were negative for alcohol, but Soberlink was unable to recognize mother's identity. In each case, Soberlink registered multiple compliant tests later the same day.

17

magistrate's resolution of conflicting evidence, we may not disturb the magistrate's finding on this point.

¶ 33    Overall, while there was evidence pointing in both directions, including evidence that the children were thriving in mother's care, we conclude that there is sufficient evidence in the record to support the magistrate's endangerment finding.

### D.    Balancing of Harm

¶ 34    Finally, mother argues that the magistrate "did not address whether the harm in changing the parenting time and the [children's] primary residence would be outweighed by the advantages to the [children]."

¶ 35    On the contrary, the magistrate explicitly acknowledged that changing the primary residential parent would present "adversity" for the children and "could . . . have a large impact on" them, particularly because "[f]ather has primarily been the 'fun summer' parent and not the school year 'homework and chores' parent." "Exposure to more adverse childhood experiences," the magistrate noted, "affects the well-being and health of . . . children throughout their lifetimes."  The magistrate also acknowledged that "[t]here is ample evidence that [f]ather was a perpetrator of domestic violence

18

in 2018," although there had been no reported incidents since that time.

¶ 36 Nevertheless, the magistrate concluded that the "children need a stable environment in which a parent is alert and able to parent, and the children need the freedom to be safe and secure." Additionally, the magistrate explicitly incorporated the CFI's findings, including the finding that, while switching schools and being separated from their mother would have negative effects, those effects were "outweighed by the advantage to the children of residing primarily with the parent who is better able to keep them physically and emotionally safe."

¶ 37 Taken together, these findings are sufficient to show that the magistrate considered whether "the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child[ren]." § 14-10-129(2)(d).

### III. Disposition

¶ 38 The district court's order adopting the magistrate's ruling is affirmed.

JUDGE GROVE and JUDGE SCHOCK concur.